IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THICCC BOY PRODUCTIONS, INC., | : | Case No. 1:22-cv-00090-MSM-PAS |
| Plaintiff, | : | |
| v. | : | **DEFENDANTS MEMORANDUM IN OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT** |
| KYLE SWINDELLES, *et al*., | : | |
| Defendants. | : | |

## INTRODUCTION

Defendant Kyle Swindelles, *pro se*, hereby responds in opposition to Plaintiff's *Second Motion For Summary Judgment*. Plaintiff's motion should be denied on the merits and due to mootness as Defendant has thoroughly demonstrated that his videos constitute fair use. Should the Court accept Plaintiff's requested re-writing of copyright law and grant the motion, however, it still could not grant damages of more than the range of $0 to $304.

### I. PLAINTIFF SEEKS AN ERRONEOUS CALCULATION OF DAMAGES FOR COPYRIGHT INFRINGEMENT.

The Copyright Act of 1976 lays out the standard for damages in a copyright infringement action. The law provides:

> The copyright owner is entitled to recover the actual damages suffered ... as a result of the infringement, and any profits of the infringer ***that are attributable to the infringement*** and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work. 17 U.S.C. § 504(b). (emphasis added).

A damages award of the infringer's profits can only occur if the profits exceed the actual damages. In the current case, Plaintiff has presented no evidence of any actual damages. The presumption is, therefore, that Plaintiff suffered no actual damages. The law also allows for statutory damages in circumstances that do not apply to this case.

When a plaintiff seeks to obtain the infringer's profits as damages, the courts use an analytical concept called apportionment to determine the correct amount. Plaintiff includes the relevant legislative history explaining apportionment in its motion. Where Plaintiff goes astray in its analysis, however, is that it asks the Court to ignore that the law requires damages to be at least reasonably "attributable to the infringment." Plaintiff seeks all of Plaintiff's income from all sources for a five-month period, even though the evidence shows that the vast majority came from sources other than the four Accused Videos in this lawsuit. This is well beyond the legal standard and clearly erroneous.

**A. Contrary to the legal standard for calculation of damages in copyright infringement, Plaintiff asks the Court to award it ALL of Defendant's income from ALL sources for the time frame in question.**

Plaintiff beats the drum of its "minimal burden" of showing Defendant's gross revenues, which then shifts the burden to Defendant to show which profits were not attributable to the infringement. To support this, Plaintiff cherry-picks a quote from the ruling in *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390 (1940). The quote states that when an infringer "has frustrated the task of apportionment by co-mingling profits" he is "responsible for the blending of the lawful with the unlawful" and has "to abide the consequences." *Sheldon*, at 401. Note that the *Sheldon* court was referring to two 19th Century cases where publications (one a reporter of court cases, the other a recipe book) had spread the infringing materials throughout so much of their respective

2

books that it was impossible to separate the legitimate from the infringing. That is not the situation here. The current case involves four videos about a particular podcast, and evidence established that Defendant's profits overwhelming came from other videos not even associated with the TFATK podcast or its copyrights.

The big picture that Plaintiff misses with its filing is that modern courts are keenly aware that the law requires damages to be "attributable to the infringement." In that sense, plaintiffs must show that their demand for "gross revenue" is reasonably related to the infringement. You cannot just ask for all of a company or individual's gross profits from every source, which is what Plaintiff seeks here. The case law Plaintiff cites in its motion is instructive on this point. In *Grumman*, Data General sought Grumman's gross profits only as they related to its business servicing Data General's copyrighted MV computer systems. They did not seek ALL of Grumman's profits from ALL of their computer services. In *Danielson*, the plaintiff sought gross profits for the real estate development that infringed its design plans, not the defendant's gross revenue from all real estate development. In *Bruce*, the plaintiff sought the profits Weekly World News obtained from products actually using his copyrighted photograph, not all of their gross sales from all products.

Evidence shows that Kyle Swindelles' YouTube channel was his sole source of income. Swindelles Deposition, at pp. 11-13. **Exhibit A**. Plaintiff admits that the YouTube channel was *not* solely videos about TFATK, but rather a multitude of topics including "gaming, comedy, radio, podcasts, and other forms of popular media." *Plaintiff Statement of Undisputed Facts* at ¶ 6. Swindelles estimates that he had posted around 1,000 videos on the channel before Plaintiff had it canceled with DMCA strikes.

3

Swindelles Dep., at121:15-122:8. **Exhibit B**. Plaintiff now seeks a ruling on damages for only four videos about TFATK out of around one thousand on many different topics. Asking for all of Defendant's revenue for all of the videos he made is inappropriate. Courts have dealt with this exact scenario in other cases. In *Davis v. Gap, Inc.*, 246 F.3d 152 (2nd Cir. 2001), plaintiff Davis claimed that Gap Inc. infringed his copyright by using his copyrighted eyewear design on a model in an advertisement for its Gap label stores. As part of his damages calculation, Davis sought Gap Inc.'s gross profits from all sources for a time period after the advertisement ran, a total of $146 million. The Court found that "it was incumbent on Davis to submit evidence at least limited to the gross revenues of the Gap label stores, and perhaps also limited to eyewear or accessories." *Id.*, at 160. The Court acknowledged the literal interpretation of the statute, but clarified, "we think the term 'gross revenue' under the statute means gross revenue related to the infringement, not unrelated revenues." *Id.*, at 160. The court further explained:

> Thus, if a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. *Id.*, at 160.

A similar situation occurred in *Taylor v. Meirick*, 712 F.2d 1112 (7th Cir. 1983). In that case, the defendant map-maker copied and sold three of the plaintiff's copyrighted maps without permission. Plaintiff submitted damages evidence of gross revenues and profits deriving from the defendant's overall sales of 150 different maps and other merchandise. The Court ruled that the plaintiff could have made his case "by showing [the defendant's] gross revenues from the sale of the infringing maps. It was not enough

4

to show [the defendant's] gross revenues from the sale of everything he sold . . ." *Id.*, at 1122. Clearly, Plaintiff in the current case cannot credibly seek all of Defendant's revenues from all of the videos he made on various topics.

> **B. Plaintiff ignores the evidence showing that Defendant's total possible liability is between $0.00 and $304.00.**

Unsurprisingly, Plaintiff ignores the evidence regarding Defendant's possible liability, instead acting as if it does not exist. This Court, however, ensured that such evidence would exist through one of its own orders. At an April 25, 2023, discovery dispute hearing, the magistrate advised that I should compose a statement estimating how much money I made from the Accused Videos with bank statements attached. I did so through a sworn and notarized statement, which I electronically delivered to Plaintiff's counsel with bank statements on April 27, 2023. That statement is attached as **Exhibit C**.

Plaintiff now includes the information from the bank statements in its motion, but completely ignores the sworn statement. Counsel will predictably claim that it is inadmissible or unreliable. On admissibility, the detailed revenue information on the Accused Videos that was previously available in my YouTube account is gone; Plaintiff pursued an unnecessary strategy of multiple DMCA strikes on my videos to ensure my YouTube account would be shut down, making all of that information inaccessible. Article X of the Federal Rules of Evidence generally requires an original copy of a document to be admitted, but outlines procedures for when the original is not available. A party may provide "secondary evidence" if it can establish an acceptable reason for why the original item is not available. Fed. R. Evid. 1004. This is known as the "best evidence rule." Under the best evidence rule, my affidavit is admissible evidence because the YouTube data is not available (due to Plaintiff's intentional and unnecessary actions). I

5

created the videos. I posted the videos. I handled the income that resulted. My recollections are the best evidence, and nobody else's testimony will hold the weight that mine does. Plaintiff destroyed the original evidence and now hopes to reap a windfall from its actions.

On reliability, we have gone down this road before. After Plaintiff's attorney previously ignored my multiple requests seeking production of the Accused Videos, I submitted a sworn affidavit of my recollections of the videos with my first motion for summary judgment. My recollections were accurate enough that Plaintiff declined to submit the videos to counter me in its response. The Court noted that this created an inference of the reliability of my statement. This situation is no different. If they somehow posses the detailed YouTube revenue data, they have an opportunity to present it now. If not, my affidavit is admissible and controlling.

The statement contains several points of fact that are determinative in the damages calculation. Most important is the fact that the Accused Videos were deactivated and demonetized prior to payment, meaning YouTube would have paid me zero dollars in revenue for those four videos. **Exhibit C**, at 6,7. Alternatively, it is my estimation that I was making about $16 per video at the time of my account cancellation in February 2022. **Exhibit C**, at **11.** This is the best evidence we have as far as revenues from the Accused Videos. The math is easy: 4 videos multiplied by $16 results in a total possible liability of $64. If the Court rules for Plaintiff and wishes to apply that number to the five-month period the Accused videos appeared prior to demonetization (September 2021-January 2022), the total possible liability comes to $304 (Video 2 was not posted until late October/early November, so revenue would not have been paid until November or

December. This generous calculation estimates it was up for 4 months, October through January). That is Defendant's maximum liability should the Court rule in Plaintiff's favor. In determining apportionment of profits, courts emphasize that "[e]quity is concerned with making a fair apportionment so that neither party will have what justly belongs to the other." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147 (1st Cir. 1994), quoting *Sheldon* at 408. The *Sheldon* case, which established apportionment of profits within the copyright realm, illustrated well the inexact nature of apportionment. The Supreme Court noted the "impossibility of reaching a conclusion that is mathematically exact." *Id.*, at 403, quoting *Chicago, M. & St.P. Ry. Co. v. Tompkins,* 176 U.S. 167 (1900). The Supreme Court further explained the inexactness of apportionment with the case of *Dowagiac Mfg. Company v. Minnesota Moline Plow Co.*, 235 U.S. 641 (1915). The Court elaborated:

> In the *Dowagiac* case, we again referred to the difficulty of making an exact apportionment, and again observed that mathematical exactness was not possible. What was required was only "reasonable approximation," which usually may be attained "through the testimony of experts and persons informed by observation and experience." Testimony of this character was said to be "generally helpful, and at times indispensable, in the solution of such problems." The result to be accomplished "is a rational separation of the net profits so that neither party may have what rightfully belongs to the other." *Id.,* 235 U. S. 647.
> *Sheldon*, at 404.

In the current case, we are easily able to make a "reasonable approximation" based upon the "indispensable" testimony of a "person informed by observation and experience." That person is Kyle Swindelles, and his sworn statement is clear that possible total liability for infringement in this case is between $64 and $304 . Defendant has shown a "reasonable approximation" of the revenues based upon "observation and experience," as justice demands.  Plaintiff has shown nothing but greed and disregard for the law. The

7

Thiccc Boys want to have what rightfully belongs to me, but they are not entitled to any such windfall.

## CONCLUSION

Brendan/Bryan Schaub cowers behind his embarrassingly-named LLC and "monster lawyers" but wants to personally destroy me. He admittedly initiated this suit to address "defamation of character," and his team has conducted itself in bad faith to shut down my YouTube channel and make this litigation as long and painful as possible. They knew I could not afford a lawyer, knew I would have trouble navigating legal responses and the rules of procedure, and now know that I do not have $13,000 to pay in ridiculous hypothetical damages. Luckily, the law is on my side, and their claims are all unsupported and contrary to law. Plaintiff's lazy analysis is unpersuasive, and its *Second Motion for Summary Judgment* should be denied.

Respectfully submitted,

*Kyle Swindelles*

Kyle Swindelles, Defendant, *pro se*
41 Marietta Street, 2nd Floor, Unit 4
Providence, Rhode Island 02904
Phone: (401) 230-5061
e-mail: yewneekent@gmail.com

# EXHIBIT A

CONFIDENTIAL

```
 1   the time, or did you have your own place?
 2        A.   I lived with them at the time.
 3        Q.   And when did -- when did you leave your
 4   grandparents place?
 5        A.   2011, was it?
 6        Q.   And where did you go?
 7        A.   Moved in with my girlfriend.
 8        Q.   Does she work?
 9        A.   No.
10        Q.   So currently, do your grandparents still
11   pay your bills?
12        A.   No.
13        Q.   So -- from where do you receive income?
14        A.   My girlfriend gets SSI.
15        Q.   SSI, is that disability?
16        A.   Yes.
17        Q.   And how long has she had SSI?
18        A.   Her entire adult life.
19        Q.   Is she disabled?
20        A.   Yes.
21        Q.   And so she's unable to work; is that
22   correct?
23        A.   Yes.
24        Q.   And you said you were married?
25        A.   No, we're not married.
```

Page 11

CONFIDENTIAL

```
 1        Q.   And you have children?
 2        A.   Yes.
 3        Q.   How many?
 4        A.   Four.  Two of them are autistic, and they
 5   get SSI too.
 6        Q.   What would you say your monthly income is
 7   from SSI?
 8        A.   I don't know, it's not my income.
 9        Q.   Who pays the rent?
10        A.   She does.
11        Q.   Does she buy all the food?
12        A.   She buys everything.  I don't have any
13   money.
14        Q.   When did you start making YouTube
15   videos?
16        A.   Around 2017, I believe.
17        Q.   And what type of videos did you make?
18        A.   Tom and Terry videos.
19        Q.   What was the subject of your videos?
20        A.   Like Opie Anthony or Howard Stern.
21        Q.   And when you would make a video about
22   Howard Stern, what would you -- what would you say
23   in the videos, for example?
24        A.   Then, something he talked about that day
25   or something that happened in the news.
```

Page 12

CONFIDENTIAL

```
1       Q.   And did you start making money off of the
2   YouTube videos that you made?
3       A.   Yeah.
4       Q.   How do you make money off of your
5   videos?
6       A.   Ad revenue.
7       Q.   Any other way?
8       A.   No.
9       Q.   When you first started making money in
10  2017 at ad revenue from YouTube videos, about how
11  much did you make?
12      A.   I don't know.
13      Q.   You have no idea?
14      A.   No.
15      Q.   Was it $100 a month?  $1,000 a month?
16  $10,000 a month?  $100,000 a month?
17      A.   I would say back then, a couple hundred.
18      Q.   $100 a month?
19      A.   A couple of hundred I would say back
20  then.
21      Q.   And so you enjoy making videos about other
22  programs and other personalities, is that what you
23  do?
24      A.   Yeah.  I mean, yes.
25      Q.   Can you describe the process of how -- let
```

Page 13

# EXHIBIT B

CONFIDENTIAL

1  Q. There are about 226 videos on that channel
2  which you mostly posted and started, correct?
3  A. I didn't start the channel, but, yeah, I
4  post on there from time to time.
5  Q. Well, didn't you say that most of the
6  videos you recorded?
7  A. Oh, yeah. Yeah, I record most of the
8  videos.
9  Q. And you appear in most of those videos,
10 correct?
11 A. Yeah.
12 Q. In fact, you probably appear in almost all
13 the videos, would that be incorrect?
14 A. Yeah.
15 Q. So -- and then going back to the Yew Neek
16 channel, how many videos approximately were on there
17 before the channel was taken down?
18 A. I have no idea. You told me the number
19 before though.
20 Q. Not for the older channels, no, I did
21 not --
22 A. I thought you did for Yew Neek.
23 Q. I'm sorry?
24 A. I thought you did for that Yew Neek
25 channel. Maybe you didn't. I don't know though.

Page 121

Verdext Legal Solutions

CONFIDENTIAL

```
 1    Q.   Was it over 100?
 2    A.   Yeah, it had to have been well over 100.
 3    Q.   Was it over 200?
 4    A.   I would say it would probably get into the
 5  1,000 area.
 6    Q.   Wow, 1,000 videos.  And so out of those
 7  1,000 videos, how many videos did Thiccc Boy send a
 8  takedown notice to you for?
 9    A.   I couldn't tell you exactly.
10    Q.   Do you have any evidence with you today or
11  any evidence that you've produced to Thiccc Boy to
12  show that there were more than four takedowns with
13  respect to any videos on the -- and on any of your
14  YouTube channels?
15    A.   No.
16    Q.   And with respect to the videos on the Yew
17  Neek Entertainment channel, have you received any
18  takedown notices from Thiccc Boy Productions?
19    A.   No.
20    Q.   And if Brendan Schaub or Thiccc Boy wanted
21  to take your channels down, don't you think they
22  would have filed more takedown notices?
23    A.   There's nothing they could do on that Yew
24  Neek Entertainment channel.
25    Q.   Why is that?
```

Page 122

# EXHIBIT C

## STATEMENT OF KYLE SWINDELLES

STATE OF RHODE ISLAND    )
                         ) ss.
COUNTY OF PROVIDENCE     )

KYLE SWINDELLES, having first been duly cautioned and sworn, deposes and says that:

1. I lost access to my YouTube channel around February 28, 2022, when Thiccc Boy Productions, Inc., ("TBP") filed a lawsuit (1:22-cv-00090) against me.

2. Because my YouTube channel was deactivated, I do not have access to specific revenue information on any particular video that was posted to that YouTube channel.

3. TBP alleges that I infringed their copyrights by making and uploading four (4) commentary videos that made use of short audiovisual clips of "The Fighter and the Kid" ("TFATK") podcast.

4. I believe but cannot verify that the four (4) videos named in the lawsuit by TBP were uploaded to my YouTube page during February of 2022.

5. In February of 2022, TBP filed four (4) separate Digital Millennium Copyright Act ("DMCA") takedown notices with YouTube on my videos that used the TFATK clips.

6. Due to TBP's DMCA takedown notices, YouTube deactivated and demonetized the four (4) videos later named in the lawsuit.

7. Because the four (4) named videos were deactivated and demonetized prior to any payments, YouTube would have paid me zero (0) dollars in revenue for those videos.

8. In March of 2022, I received revenue from YouTube in the total amount of $455.27 for videos uploaded to my channel in February of 2022. (bank statement attached)

9. During February of 2022, I was creating and uploading approximately one (1) video per day to my YouTube channel on various topics.

10. Because my YouTube channel was deactivated, I do not have access to any information about how many times my individual YouTube videos from February 2022 were viewed by users online.

11. While the revenue from individual YouTube videos can fluctuate wildly, the information I have available to me indicates that my YouTube videos were generating an average of about sixteen dollars ($16) in revenue per video in February of 2022.

12. Because my YouTube channel was deactivated, I do not have access to specific information about how much average or total revenue the four (4) videos named in the lawsuit would have generated if they had not been deactivated and demonetized.

13. TBP's actions that led to the deactivation of my YouTube channel have caused me financial harm through lost revenue as its lawsuit is pending.

FURTHER AFFIANT SAYETH NAUGHT.

*Kyle Swindelles*

On this 26 day of April, 2023, before me personally appeared Kyle Swindelles, to me known to be the person described herein who executed the foregoing instrument and acknowledged that he voluntarily executed the same.

*Mary E. Grigas*
Notary Public
4-26-2023