## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| THICCC BOY PRODUCTIONS, INC., | : | Case No. 1:22-cv-00090-MSM-PAS |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **DEFENDANT** |
| | : | **KYLE SWINDELLES'** |
| KYLE SWINDELLES, *et al*., | : | **REPLY TO** |
| | : | **PLAINTIFF THICCC BOY'S** |
| Defendants. | : | **MEMO IN OPPOSITION** |

This Court has a simple question to answer: if a vengeful celebrity retains counsel to silence and harass a person for discussing his marital infidelities, the counsel files a flimsy copyright case to silence and harass that person, then takes actions in litigation meant to cause delays and harass the person, is it sanctionable conduct? In other words, does "presented for any improper purpose" in Rule 11 actually mean what it clearly states?

Plaintiff's counsel unsurprisingly dodges any explanations about his questionable conduct during this litigation and continues to misrepresent the record to this Court. Instead, he focuses on pointing the finger at me and slogging through the minutia of the rules of procedure about what attorneys are generically "entitled" to do in litigation. Just as with his feeble copyright arguments, he misses the big picture. No one doubts that the rules of procedure entitle parties to conduct discovery, raise objections, and hold depositions. Those rules do not entitle a party to file a lawsuit with the primary intent to harrass/silence a defendant, to pick and choose when it will ignore discussions about discovery, and decide how much harassment of an unrepresented party is proper in a deposition. In fact, Rule 11 exists precisely to prevent such actions. Attorneys are not entitled to such behavior, even if they are used to feeling extremely entitled in litigation.

1

The bigger picture shows that this entire action was brought and litigated for the "improper purpose" of harassing and silencing me, which is certainly sanctionable conduct.

First of all, Plaintiff's counsel never sent me a letter "refuting each of the points made by [me]" in my Motion for Sanctions. Instead, he sent a letter that avoided explaining any of the points about his own behavior, posited that his client is so clueless as to not know the difference between defamation of character and copyright infringement, and mostly just drudged through the sections about the cited case law. The last page of the letter even says, "While this letter does not purport to address each of the baseless arguments raised in your motion, we hope it serves to deter you from filing the same." **Exhibit A**. The misrepresentations almost seem pathological at this point. The primary purpose of that letter was to threaten me that they may file a retaliatory sanctions motion against me if I file my motion. As we will see, such threats are par for the course for Plaintiff's counsel. But yet again, counsel feels entitled to misrepresent that letter to the Court.

Counsel also misrepresents the record regarding the public statements of his client, Thiccc Boy CEO Brendan Schaub. I previously submitted evidence of Schaub publicly admitting that this lawsuit is primarily about silencing and attacking me for "defamation of character" regarding the "narrative of [Schaub] cheating on [his] wife." Schaub admitted that he thought my words would negatively affect his family and business, so he was utilizing his "monster lawyers" and "coming for [me]." Plaintiff's counsel attempts to excuse this obvious admission by misrepresenting the record, claiming that Schaub ignorantly said these words before he had received legal advice. This is not correct.

Schaub made those comments in May of 2022, almost *three months **after*** this lawsuit was filed. This is just a rare case of a full, damning confession of bad faith that cannot be explained away. *See "Schaub Show: Cain Velazquez Denied Bail Twice"* posted by Thiccc Boy on May 16, 2022. https://www.youtube.com/watch?v=dvJ-iVOt7iY, at 0:43:58 - 0:46:40.

If there is any remaining doubt about the bad faith of this lawsuit, Schaub obliged us all by reinforcing this admission very recently. A YouTube page called "Hot Breath! Comedy Network" posted an interview with Schaub on **December 12, 2023**, just days before this filing. The interviewer asks Schaub how he handles negativity online, which led to this enlightening exchange:

> INTERVIEWER: Have you done anything to try to like, um, suppress or get on top of it?......Can you sue people? Have you tried doing any of that?
>
> SCHAUB: No, I mean, we got, we have, we have a lawsuit with a guy who made like 3,000 videos. Again, if you're gonna critique stand up or my fight picks or whatever, my football picks, all good. That's what the internet's for. Now if you're gonna go out there and, uh, defamation....like, you know, whatever, 'Brendan hits his kids or beats his wife,' well then you got my attention. I'mma come after you. That game I don't play. And the guy's suffering from that, so, that is whatever.
>
> https://www.youtube.com/watch?v=IwlJfvjTEa8, at 27:29.

Schaub then notes his "ten endorsement deals" and how he is in the "business of likability." Oddly enough, after almost two years of aggressive litigation and extensive legal counsel, Schaub still does not mention copyright protection as the reason for the lawsuit. Instead, according to Schaub, he has me "suffering" through this litigation because of "defamation." For the record, I have never, ever made an allegation that

Schaub commits violence against his family.[1] Have I discussed his own actions recorded and broadcast to the world that may be humiliating to him and his family? Sure, and that is why this lawsuit exists. Counsel argues that Schaub is but an empty vessel adrift in the legal seas, wishing to valiantly protect his copyright interests but lacking the vocabulary to articulate the concept. As we can clearly see, that is laughable. Schaub has now made multiple public admissions between the period of February 2022 through December 2023 that he faced allegations of misconduct, retained "monster lawyers" to "go after" people talking about the allegations, and he ended up suing me because he thought my so-called "defamation of character" was hurting his family and business. With California and Rhode Island's strong anti-SLAPP (Strategic Lawsuits Against Public Participation) laws, Schaub could not sue me in state courts to suppress my speech.[2] Instead, counsel helped him devise a scheme to sue me in Federal court, where there is no anti-SLAPP law. Copyright seems like the perfect loophole for a vengeful celebrity seeking to silence a YouTube page making fun of him. There is no denying the bad faith of this entire action.

So if an attorney files a lawsuit intended to silence and harass a defendant, but does it under the guise of an arguably cognizable claim, can the court still examine the intent of the action for misconduct? This goes back to the big picture of this lawsuit. Plaintiff's counsel seeks to drown the court in procedural minutiae about his "entitlements," but I have undeniably shown that this action was taken and pursued for an "improper purpose." Luckily, there is a case on point that illuminates the current situation. *In re DMCA § 512(h) Subpoena to Twitter, Inc.*, 3:20-mc-80214 (N.D. Calif. 2020)

---

[1] Ironically, Schaub has now publicly associated me with pedophilia, child abuse, and domestic violence allegations while claiming that I committed "defamation of character" by discussing his alleged infidelities that were publicly exposed by two female entertainers on a popular podcast.

[2] Schaub's TFATK co-host Bryan Callen retained *Glaser Weil* to sue his rape accuser's husband and stop him from publicly speaking about the allegations. That California lawsuit ended soon after the defendant filed an anti-SLAPP motion. *Callen v. Tigerman*, 20-ST-CV-36391 (Superior Ct. of Calif. 2020)

addressed similar misconduct related to copyright issues with the involvement of a familiar face. *Attached*.

In October 2020 a Twitter user with less than 400 followers posted a series of photographs on the anonymous @CallMeMoneyBags account. Those pictures depicted a woman in various states of undress and implied that she was the mistress of married private equity billionaire Brian Sheth. That same month, a mysterious corporation called Bayside Advisory LLC formed. Bayside, a previously unknown entity with no record of business and only a shell web site, retained Thiccc Boy Robert E. Allen of *Glaser Weil* as counsel.

Bayside claimed copyright on the photos and subpoenaed Twitter to unmask the anonymous user behind the @CallMeMoneyBags account. Twitter filed a motion to quash the subpoena on First Amendment and fair use grounds. Bayside responded in opposition, including an odd introduction that gave a detailed description of Twitter's DMCA complaint process (Twitter's DMCA complaint process was not a relevant matter before the court). Twitter's attorney from *Perkins Coie* asked the court to disregard Bayside's irrelevant discussion of their DMCA process. What is notable, however, is that she also felt compelled to alert the court about opposing counsel's behavior in the process. She wrote:

> In immediate response to Twitter's filing its Motion, Bayside's counsel [*Robert E. Allen*] called Twitter's counsel, asking Twitter to withdraw the Motion. If Twitter refused, Bayside warned, then Bayside's opposition would "expose" Twitter's DMCA practices, which he suggested "could invite" future litigation. Twitter declined to withdraw the Motion, as Bayside's claims are meritless, and Twitter's practices have now been outlined for no apparent reason. *Twitter's Reply in Support of Motion to Quash*, p. 11.

Put simply, Robert E. Allen attempted the old mafia "protection racket" tactic of threatening a business to acquiesce to his demands lest he take action to destroy them. When Twitter did not back down, he followed through on the threat, using a court filing to carry out his revenge.

Bayside would go on to make many of the same impotent fair use arguments against Twitter that it has made against Kyle Swindelles, and the court rejected most of them, quashing the subpoena. Judge Vince Chhabria sought, however, a closer examination into the conduct of Bayside's counsel. Since Bayside had never licensed photographs before and had no available information about its executives, staff, physical location, or primary business, the court needed further information to determine commerciality, markets, and whether Brian Sheth had any involvement. Instead of providing admissible evidence, Robert E. Allen simply submitted an inadmissible declaration that "Bayside is not and has not ever been owned or controlled by Brian Sheth." The judge noted that this was not a declaration from "a party with personal knowledge." *In re DMCA/Twitter*, p.13. Yet Allen still signed it under penalty of perjury and submitted it to the court. Allen tried the same antics in discovery for Thiccc Boy, claiming that he alone answered the interrogatories directed to Thiccc Boy Productions, Inc., even though there is no possible way he had personal knowledge of all of the company's information. This is not honest litigating; it is obfuscation solely to shield your rich clients from accountability.

Allen and his co-counsel refused to give any relevant information about Bayside Advisory LLC, choosing to allow their subpoena to be quashed instead of providing information that might have given them a chance to prevail on copyright grounds. The

Court also noted that it seemed odd for such extensive litigation to occur when the Twitter user likely made little to no money from the candid photos.[3] This gave the obvious appearance that copyright protection was never the point of the litigation. Judge Chhabria noted:

> Given all the unknowns, at oral argument the Court offered Bayside an opportunity to supplement the record with an evidentiary hearing or additional documentation. Bayside declined, stating that it preferred the motion to be adjudicated on the current record. There would perhaps be some benefit in insisting on an evidentiary hearing to explore the circumstances behind this subpoena--to explore whether Bayside and its counsel are ***abusing the judicial process*** in an effort to discover MoneyBags's identity ***for reasons having nothing to do with copyright law***. (emphasis added) Perhaps that hearing could even result in an award of attorney's fees for Twitter.

Twitter declined to go forward with the evidentiary hearing that may have exposed Bayside's counsels' misconduct. I assume it would be bad for business if a big law firm got a reputation for holding billionaires and bad faith litigators accountable, so Twitter's counsel let them off the hook.

I have no need to extend such courtesy. The Northern District of California clearly identified disturbing behavior by Robert E. Allen and his co-counsel, suggesting that they may have brought their case for an improper purpose aside from copyright. The Thiccc Boy litigation is no different. We have clear video of the Thiccc Boy CEO admitting multiple times that he was "coming after" me for "defamation of character" regarding the "narrative of cheating on my wife" that he thought was affecting his "family and business." Robert E. Allen took his marching orders (and apparently "half a million dollars") to silence and harass me, concealing it under the thin veil of a flimsy

---

[3] Thiccc Boy Productions, Inc. has now litigated this case for almost two years, claiming to have paid a $500,000 retainer, yet seeks to recover about $12,000 from this action (actual possible recovery between 0 and about $300).

copyright claim. He has since conducted himself in a way to cause delays and harass me with lingering litigation: monitoring my online activity and sending irrelevant recordings to the Court, scheduling a last-minute deposition just before the discovery deadline, grilling me about what jokes are appropriate, threatening to depose the mother of my kids, ignoring my discovery requests and then lying to the court about it, and having to be forced by the court to reveal the Accused Videos a full year after filing the lawsuit. And now, faced with a Motion for Sanctions that will require him to answer for his conduct, he asked the Court to indefinitely postpone his response and move the case to mediation. It is abundantly obvious what is going on here, and the public's faith in the legal system remains shaky because such bad actors so rarely see any accountability. Travis McDermott sponsored Allen to appear in Rhode Island *pro hac vice*, so he bears responsibility for this as well.

Admittedly, my Motion for Sanctions does need one correction. Since this litigation has continued to drag on, the appropriate amount of monetary sanctions (based off the previously-outlined formula) through the end of December 2023 is now **$54,595.20**. If the Court chooses the alternate formula, those monetary sanctions would be **$40,150**. These amounts would be paid directly to Kyle Swindelles by Robert E. Allen through his law firm of *Glaser Weil*, and by Travis McDermott through his firm of *Partridge Snow & Hahn*. Allen makes the outrageous argument that his bad faith destruction of my "Yew Neek Ness" channel should be excused because I may be receiving compensation from other audiovisual content. Nonsense. In no conception of justice does an arsonist get exonerated for destroying someone's property just because the victim may have tried to rebuild from the ashes.

## CONCLUSION

Counsel had a choice to make regarding how to handle a celebrity's personal cancel culture campaign. Unfortunately, he chose the more lucrative path, but one that could expose that maybe "monster lawyers" are not "entitled" to abuse the court system for transparent revenge campaigns. Travis McDermott, the sponsoring attorney for Allen's admission, watched this abuse of the court system, yet sat silent throughout. Based on the unequivocal and undisputed evidence that this lawsuit was filed and litigated for an improper purpose, sanctions payable to the Defendant are appropriate.

Respectfully submitted,

*Kyle Swindelles*

Kyle Swindelles, Defendant, *pro se*
41 Marietta Street, 2nd Floor, Unit 4
Providence, Rhode Island 02904
Phone: (401) 230-5061
e-mail: yewneekent@gmail.com

# EXHIBIT A

# Glaser Weil

10250 Constellation Blvd.
19th Floor
Los Angeles, CA 90067
310.553.3000 TEL
310.556.2920 FAX

Robert E. Allen

**Direct Dial**
310.282.6280
**Direct Fax**
310.785.3580
**Email**
rallen@glaserweil.com

October 18, 2023

<u>VIA E-MAIL</u>

Kyle Swindelles
41 Marietta Street, 2nd Floor, Unit 4
Providence, Rhode Island 02904
yewneekent@gmail.com

Re:     <u>Defendant's Motion for Sanctions</u>

Dear Mr. Swindelles:

We have received your draft motion for sanctions, served on September 23, 2023, and reviewed its contents with our client, Thiccc Boy Productions, Inc. ("TBP"). Overall, we find your proposed motion wholly baseless and untimely, and, if filed, will make you susceptible to Rule 11 sanctions. As such, we strongly advise you not to file this frivolous motion and to seek competent, independent legal counsel to properly advise you before you subject yourself to possible sanctions.

Primarily, you contend that we "obviously" initiated this case on the assumption that we "could bully and overwhelm a *pro se* defendant into a [sic] easy settlement or default judgment." At the outset of this lawsuit, we had no possible way of forecasting that you would be representing yourself. More importantly, while *pro se* litigants are generally to be treated with more leniency than those represented by counsel, the "right to self-representation is not a license not to comply with relevant rules of procedural and substantive law." *Eagle Eye Fishing Corp. v. United States Dept. of Commerce*, 20 F.3d 503, 506 (1st Cir. 1994). Indeed, throughout this litigation, the Court and TBP's counsel has afforded you the utmost leniency and respect so your repeated complaints that we have taken advantage of your lack of legal knowledge are unavailing.

As you point out, Rule 11(b) governs representations to the court and requires "an attorney *or unrepresented party*" to certify that what is presented to the court is formed from an inquiry that is reasonable under the circumstances. Rule 11 applies with equal force to unrepresented parties. "Under Rule 11, a court may impose sanctions on a lawyer 'for advocating a frivolous position, pursuing an unfounded claim, or filing a lawsuit for some improper purpose.'" *In re Ames*, 993 F.3d 27, 34

Kyle Swindelles
October 18, 2023
Page 2

(1st Cir. 2021) (quoting *CQ Int'l Co. v. Rochem Int'l, Inc., USA*, 659 F.3d 53, 60 (1st Cir. 2011)).

You argue that this action was filed solely for the improper purpose of harassing you and "to stop 'defamation of character.'" While this is not a defamation lawsuit, Mr. Schaub, much like yourself, is neither a lawyer nor understood the proper legal position to take when he made that statement, which is why he hired counsel. However, there is no doubt that TBP has a valid copyright infringement claim against you given that (1) it owns the four copyrighted works at issue that have been timely registered with the Copyright Office; and (2) you copied TBP's copyrighted works in connection with the making of your videos and then posting them to your YouTube accounts. *See* 17 U.S.C. §§ 106, 501. Indeed, you have admitted to copying TBP's works.  Even if TBP ultimately does not prevail in this case because of your fair use affirmative defense, TBP's attorneys would not be subject to sanctions. *Protective Life Ins. Co. v. Dignity Viatical Settlement Partners, LP*, 171 F.3d 52, 58 (1st Cir. 1999) ("[t]he mere fact that a claim ultimately proves unavailing, without more, cannot support the imposition of sanctions.") Our conduct throughout this litigation belies any allegations that our sole intent is to "harass" or "bully" you.

You also claim that we purposefully did not include your infringing videos in our complaint so as to prevent you from filing a Fed. R. Civ. P. 11(b)(6) motion. First, our complaint expressly refers to which of TBP's videos were reposted by you, including the dates of TBP's videos. *See, e.g.,* Complaint, ¶ 10. In addition, you received a DMCA takedown notice on YouTube, which explicitly referred to and linked the exact videos being accused by TBP, and you submitted a counter-notification. As such, you cannot reasonably plead ignorance as to which of your videos were infringing. Finally, if our complaint was indeed deficient for failing to point out instances of infringement, a Fed. R. Civ. P. 12(b)(6) motion would have been *more* warranted because such motions are granted when the pleading party fails to meet the pleading standards of providing fair notice of its claims. *See* Fed. R. Civ. P. 8(a); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (a complaint "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

Further, you assert that we inappropriately cited *Dr. Seuss*, 109 F.3d 1394, 1400 (9th Cir. 1997) in our opposition to your first motion for summary judgment by failing to mention that Dr. Seuss involved a preliminary injunction. You point out that *Dr. Seuss* was analyzing the fair use factors in light of a preliminary injunction motion and that there is a different standard for summary judgment motions. While you are correct that courts viewing summary judgment and preliminary injunction apply different overall standards, both of these types of motions analyze the substance of the underlying claim. On summary judgment, under Fed. R. Civ. P. 56, the standard is whether "the movant shows that there is no genuine dispute as to any material fact

Kyle Swindelles
October 18, 2023
Page 3

and the movant is entitled to judgment as a matter of law." For a preliminary injunction, under Fed. R. Civ. P. 65, the movant must show that he or she is likely to succeed on the merits of the claim. More importantly, however, the Ninth Circuit confirmed our interpretation of this quote from *Dr. Seuss* in a case having nothing to do with a preliminary injunction, and using a period after the cited language. *McGucken v. Pub Ocean Ltd,* 42 F.4th 1149, 1163 (9th Cir. 2022) ("But [defendant] "as the proponent of the affirmative defense of fair use, 'must bring forward favorable evidence about relevant markets.'" (quoting *Dr. Seuss,* 983 F.3d at 459)); *see also Vil v. Poteau,* 2013 WL 3878741, at *6 (D. Mass. July 26, 2013) ("[I]t is the defendant's burden to present evidence of relevant markets that is favorable to its defense"). Accordingly, it was neither inappropriate nor misleading of us to cite this case.

While this letter does not purport to address each of the baseless arguments raised in your motion, we hope it serves to deter you from filing the same. "Federal courts 'possess discretionary powers to regulate the conduct of abusive litigants," which includes *pro se* parties. *United States v. Gomez-Rosario,* 418 F.3d 90, 101 (1st Cir. 2005) (quoting *Cok v. Family Court of Rhode Island,* 985 F.2d 32, 34 (1st Cir. 1993)). It is our position that your proposed motion for sanctions against TBP's counsel is "so plainly unmeritorious as to warrant the imposition of sanctions." *Zell v. Ricci,* 957 F.3d 1, 15 (1st Cir. 2020) (quoting *Eldridge v. Gordon Bros. Grp., LLC,* 863 F.3d 66, 88 (1st Cir. 2017) (internal quotation omitted)). However, if after considering this correspondence, you still believe that this litigation has been so frivolous as to warrant sanctions against us, we reserve our right to file a cross-motion for sanctions based on your motion.

Sincerely,

ROBERT E. ALLEN
of GLASER WEIL FINK HOWARD JORDAN & SHAPIRO LLP

REA:lp

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DMCA § 512(H) SUBPOENA TO TWITTER, INC. | Case No. 20-mc-80214-VC<br><br>**ORDER GRANTING MOTION TO QUASH; DENYING MOTION TO COMPEL**<br><br>Re: Dkt. Nos. 5, 10, 22 |

      In a series of six tweets accompanied by photos, an anonymous Twitter user who goes by @CallMeMoneyBags criticized Brian Sheth, a private-equity billionaire. Within a few weeks of the postings, a mysterious entity called Bayside Advisory LLC registered copyrights in the photos, petitioned Twitter to take them down, and served a subpoena on Twitter for information identifying the person behind the @CallMeMoneyBags account. Twitter has moved to quash the subpoena, arguing that revealing the user's identity would violate his First Amendment rights. Because Bayside has not made out a prima facie case of copyright infringement, and for the independent reason that the user's constitutional interest in anonymity outweighs Bayside's expressed interest in his identity (at least on this record), the subpoena must be quashed.

**I**

      @CallMeMoneyBags (let's call him MoneyBags) is an anonymous Twitter user. Although his account currently boasts over sixteen thousand followers, at the time of the events leading to this dispute his following was considerably more modest, hovering between 350 and

400. Much of his publicly viewable content consists of criticism of wealthy people, particularly those who work in tech, finance, or politics (such as Jeff Bezos, Elon Musk, and Nancy Pelosi).

In late October 2020, MoneyBags turned his attention to Brian Sheth, a private equity billionaire. Over ten days, MoneyBags tweeted about Sheth six times, each time commenting on Sheth's wealth and alleged lifestyle. One tweet, for example, reads: "Brian Sheth has upgraded in his personal life. The only thing better than having a wife . . . is having a hot young girlfriend." The tweet was accompanied by hashtags including "#FilthyRich" and "#BabeAlert" and included a photograph of a woman in a bikini and high heels. The other tweets were similar, each containing a photo of a woman and many alluding to an extramarital affair between her and Sheth.[1]

On October 29, just days after this string of tweets, an entity called Bayside Advisory LLC contacted Twitter, asserting that it had copyright ownership in the six photos and demanding that they be taken down. Four days later, Bayside registered its copyrights. Twitter ultimately took down the challenged photos (but left the text of the tweets in place). Bayside then came to court and obtained a subpoena requiring Twitter to provide information identifying the person behind MoneyBags's façade. Twitter objected, arguing that doing so would violate MoneyBags's First Amendment rights. Eventually, Twitter filed a motion to quash the subpoena and Bayside responded with a motion to compel a response to it.

The case was originally assigned to Magistrate Judge Donna Ryu, who issued an order offering MoneyBags an opportunity to file evidence in support of Twitter's motion to quash. Judge Ryu ordered Twitter to serve a copy of her order and all relevant briefing on the email address associated with MoneyBags's Twitter account and gave MoneyBags permission to appear anonymously. MoneyBags did not respond. Judge Ryu then denied the motion to quash

---

[1] October 19: "The new Mrs. Brian Sheth at the top of Beverly Hills." October 20: "Life is good when you are Brian Sheth. #NoTax . . . #Babes #PrivateJet." October 21: "Brian Sheth is the best investor in private equity. This is how he spends his money. I would say this is a good investment!" October 22: "Good morning from Mrs. Brian Sheth #2. Life is good when you're a 44-year old private equity billionaire. . . . #Billionaire #Upgrade #Sexy." October 28: "Brian Sheth is the King of Private Equity. . . . #Babes #LadiesMan."

and granted the motion to compel, noting that the court "lack[ed] a well-developed record" on which to find that MoneyBags was innocent of copyright infringement or to balance the competing interests of the parties involved. Twitter challenges that ruling here.

## II

Normally, a motion to quash involves a subpoena for discovery connected to a pending lawsuit. But this case is different. Bayside requested a subpoena under the Digital Millennium Copyright Act, which permits copyright owners to obtain subpoenas for information identifying alleged copyright infringers independent of any pre-existing lawsuit. 17 U.S.C. § 512(h). In this context, "the subpoena is its own civil case, and the motion to quash is dispositive of the sole issue presented in the case—whether the subpoena should be enforced or not." *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 880 (N.D. Cal. 2020). Because this is a dispositive motion and the parties did not consent to magistrate judge jurisdiction, the Court considers the motion to quash de novo.[2]

## III

"[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the contents of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 342 (1995). This protection applies with equal force to online speech. "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation . . . [or]

---

[2] Bayside argues that Twitter's motion to quash must be denied because it was filed too late. Under the Federal Rules, a motion to quash must be "timely" filed. Fed. R. Civ. P. 45(d)(3)(A). "Courts generally agree that a motion to quash under Rule 45 is timely if made before the date specified for compliance with the subpoena." *Handloser v. HCL America, Inc.*, 2020 WL 4700989, at *4 (N.D. Cal. Aug. 13, 2020). But where (as here) a subpoena recipient moves to quash after lodging a written objection to the subpoena, the motion to quash is timely so long as it is filed within a reasonable time after the conclusion of informal efforts to resolve the objections. See *Friedman v. Old Republic Home Protection Co., Inc.*, 2014 WL 12845131, at *2 (C.D. Cal. June 24, 2014) ("It is not appropriate . . . to rob [a party] of the opportunity to move to quash the subpoena because its good faith efforts to resolve the matter outside of Court made its request untimely under some decisions interpreting Rule 45.").

concern about social ostracism.'" *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (alterations in original) (quoting *McIntyre*, 514 U.S. at 341–42). When adjudicating discovery requests that would unmask an anonymous speaker, then, courts must consider the First Amendment implications of disclosure—just as they would when adjudicating any other discovery request that risks infringing First Amendment rights.

*Perry v. Schwarzenegger* offers a roadmap for how this inquiry should play out. 591 F.3d 1147 (9th Cir. 2010); *see In re Anonymous Online Speakers*, 661 F.3d at 1174. In *Perry*, the Ninth Circuit reviewed a district court's decision requiring the proponents of a state ballot proposition to turn over internal communications relating to their campaign strategy. *Perry*, 591 F.3d at 1152. Upon recognizing the First Amendment interests at stake, the court balanced the plaintiffs' interest in the disclosures against the constitutional burden that disclosure would impose on the defendants. *Id.* at 1162–65. The court issued a writ of mandamus vacating the district court's discovery order after finding that "discovery would likely have a chilling effect on political association," while the plaintiffs "ha[d] not shown a sufficient need for the information." *Id.* at 1165.

Operationally, the inquiry consists of two steps. First, the party seeking the disclosure must demonstrate a prima facie case on the merits of its underlying claim. Second, the court balances the need for the discovery against the First Amendment interest at stake. This resembles the analysis courts around the country have employed when adjudicating motions that would result in the unmasking of anonymous speakers. *See, e.g.*, *Dendrite International, Inc. v. Doe No. 3*, 775 A.2d 756, 760–61 (N.J. Super. Ct. App. Div. 2001); *Highfields Capital Management, L.P. v. Doe*, 385 F. Supp. 2d 969, 974–75 (N.D. Cal. 2005); *see also* Brief of Public Citizen as Amicus Curiae in Support of Neither Party, Dkt. No. 39-1, at 14–15. Thus, when adjudicating a subpoena or other request for compelled disclosure that would reveal the identity of an anonymous speaker, a court should (1) notify the speaker and provide them with an opportunity to (anonymously) defend their anonymity; (2) require the party seeking disclosure to make a prima facie showing on the merits of their claim; and (3) balance the equities, weighing the

potential harm to the party seeking disclosure against the speaker's interest in anonymity, in light of the strength of the underlying claim.

## IV

Bayside argues that three aspects of this case distinguish it from other motions in which a party seeks to unmask an anonymous speaker, making the aforementioned test inapplicable: (1) Bayside's subpoena arises under the Digital Millennium Copyright Act (DMCA), which provides its own procedures through which copyright holders can subpoena internet service providers; (2) the underlying dispute is a copyright claim, and copyright law has some First Amendment protection "built in"; and (3) the speaker has not shown up, despite an invitation to do so anonymously. None of these distinctions support application of a different test.

## A

The DMCA provides a streamlined procedure through which copyright holders may subpoena internet service providers (like Twitter) for information identifying an alleged copyright infringer. *See* 17 U.S.C. § 512(h). As discussed above, the DMCA allows copyright holders to request a subpoena directly, outside the confines of a lawsuit. The statute requires prompt compliance by the service provider: "Upon receipt of the issued subpoena . . . the service provider shall expeditiously disclose" the required information to the copyright owner, "notwithstanding any other provision of law." § 512(h)(5). Bayside argues that this restriction divests the court of authority to consider the merits of the copyright claim or issues of First Amendment privilege when faced with a motion to compel or quash a DMCA subpoena.

Bayside's reading of the DMCA raises serious constitutional concerns. After all, it is not enough to say that a speaker could assert their right to anonymity after their identity has been revealed; at that point, the damage will have been done. Fortunately, the statute does not compel (or permit) this result. Section 512(h) provides that "the procedure for issuance and delivery of the subpoena, and the remedies for noncompliance with the subpoena, shall be governed to the greatest extent practicable by those provisions of the Federal Rules of Civil Procedure governing the issuance, service, and enforcement of a subpoena duces tecum." § 512(h)(6). This provision

incorporates Federal Rule 45, under which a court must "quash or modify" a subpoena that "requires disclosure of privileged or other protected matter." Fed. R. Civ. P. 45(d)(3)(A)(iii). A recipient of a DMCA subpoena may therefore move to quash on the basis that the subpoena would require disclosure of material protected by the First Amendment. *See, e.g.*, *Signature Management Team, LLC v. Automattic, Inc.*, 941 F. Supp. 2d 1145, 1152–53 (N.D. Cal. 2013); *In re Verizon Internet Services, Inc.*, 257 F. Supp. 2d 244, 263–64 (D.D.C. 2003), *rev'd on other grounds*, *Recording Industry Association of America, Inc. v. Verizon Internet Services, Inc.*, 351 F.3d 1229 (D.C. Cir. 2003). The fact that the DMCA allows a potential copyright infringement victim to issue a subpoena to a service provider without first filing a lawsuit says nothing about whether courts should consider the interests of anonymous speakers in the same way they would in other situations.

## B

Bayside next argues that, to the extent MoneyBags has any First Amendment interest in this case, it is wholly accounted for through copyright's fair use analysis, which allows the public to use copyrighted works in certain circumstances without facing liability. As Bayside notes, while the First Amendment does not protect copyright infringement, "copyright law contains built-in First Amendment accommodations." *Eldred v. Ashcroft*, 537 U.S. 186, 219–20 (2003). This has led some courts to eschew interest balancing in cases seeking to deanonymize alleged copyright infringers. *See In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 882 (N.D. Cal. 2020) (noting that applying the two-step approach in the context of a copyright dispute would be "problematic" because "[t]he doctrine of fair use provides everything needed to balance the competing interests of the First Amendment and the copyright laws"). But while it may be true that the fair use analysis wholly encompasses free expression concerns in some cases, that is not true in all cases—and it is not true in a case like this. That is because it is possible for a speaker's interest in anonymity to extend beyond the alleged infringement.

Consider a hypothetical not far afield from these facts. An anonymous blogger writes hundreds of blog posts criticizing a powerful political figure, Mr. X. In one post, the blogger

includes a copyrighted image owned by Mr. X. If Mr. X were to sue for copyright infringement, the court would need to consider the interests on both sides—even if the blog post did not constitute fair use. The blogger's interest in anonymity (with respect to Mr. X) may be so great as to outweigh Mr. X's interest in enforcing his copyright.[3]

## C

Finally, Bayside argues that MoneyBags's absence dooms Twitter's motion. But although MoneyBags's presence would be helpful, it is not necessary. There are many reasons why an anonymous speaker may fail to participate in litigation over their right to remain anonymous. In some cases, it may be difficult (or impossible) to contact the speaker or confirm they received notice of the dispute. Even where a speaker is alerted to the case, hiring a lawyer to move to quash a subpoena or litigate a copyright claim can be very expensive. The speaker may opt to stop speaking, rather than assert their right to do so anonymously. Indeed, there is some evidence that this is what happened here: MoneyBags has not tweeted since Twitter was ordered to notify him of this dispute.

The Ninth Circuit has accordingly recognized that internet platforms can assert the First Amendment rights of their users, based on the close relationship between the platform and its users and the "genuine obstacles" users face in asserting their rights to anonymity. *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1183 n.2 (9th Cir. 2017). As a platform that permits anonymous posting, Twitter risks losing users if people learn that the company discloses users' identities to anyone who asks. Moreover, Twitter's interest in this dispute aligns with that of MoneyBags; both have an interest in protecting MoneyBags's ability to speak his mind on Twitter without facing retaliation. Finally, there are genuine obstacles to MoneyBags's participation, given the expense of litigation and the lack of a contrasting economic incentive in this suit. *Cf. Powers v. Ohio*, 499 U.S. 400, 415 (1991) ("[T]here exist considerable practical

---

[3] This concern still exists where the copyright owner and the subject of the anonymous speech are different people, but it can sometimes be alleviated by a court order requiring that the speaker's identity remain anonymous on the docket and that the party serving the subpoena not disclose the identity to any third party.

barriers to suits by the excluded juror because of the small financial stake involved and the economic burdens of litigation."). To be sure, MoneyBags may be better equipped to articulate his interest in maintaining anonymity in this context, but his failure to appear does not prevent the Court from considering First Amendment interests when adjudicating the motion, as it would do in a more typical case.

V

As explained above, to defeat Twitter's motion to quash, Bayside must first state a prima facie case of copyright infringement. If it can do so, the Court must weigh the potential harm to Bayside if the subpoena is not enforced against the potential harm to MoneyBags if his identity were revealed to Bayside.

A

Copying does not violate the copyright laws if it constitutes fair use. Although fair use is colloquially called an "affirmative defense" to copyright liability, this is something of a misnomer because "[f]air use is not just excused by the law, it is wholly authorized by the law." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1151–52 (9th Cir. 2016); *see* 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work . . . is not an infringement of copyright."). To make a prima facie case of copyright infringement for the purposes of obtaining a subpoena, then, a party must make a prima facie case that the infringing use did not constitute fair use. In some cases, no analysis is required; it is obvious, for example, that downloading and distributing copyrighted music via peer-to-peer systems does not constitute fair use. *See Sony Music Entertainment Inc. v. Does 1-40*, 326 F. Supp. 2d 556, 565–66 (S.D.N.Y. 2004). But in other cases, a mere description of the copying raises serious questions of fair use. *See, e.g.*, *In re DMCA Subpoena to Reddit, Inc.*, 441 F. Supp. 3d 875, 884 (N.D. Cal. 2020). This may require the copyright owner to offer evidence to make a prima facie case.

The copyright statute lays out four non-exclusive factors for evaluating whether a use constitutes non-infringing fair use. Courts are to consider:

> (1) the purpose and character of the use, including whether such use

8

        is of a commercial nature or is for nonprofit educational
        purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. The fair use analysis is fact intensive; courts are to "eschew 'bright-line rules' and 'categories of presumptively fair use,' and instead engage in a 'case-by-case analysis.'" *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577, 584 (1994)). All four factors are "to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578.

        1. Begin with the "purpose and character of the use." 17 U.S.C. § 107(1). In addition to considering the purpose of the use (whether, for example, it "is for criticism, or comment, or news reporting"), this factor asks whether the new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell*, 510 U.S. at 578–79. Put another way, this factor asks "whether and to what extent the new work is 'transformative.'" *Id.* (quoting Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1111 (1990)).

        The use here—tweets by an unverified Twitter account with a small following that only garnered a handful of likes, retweets, or comments—is not commercial, a fact that "tips the scales in favor of fair use." *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1204 (2021). What's more, the use is transformative. Considered on their own, the copyrighted photos may have aesthetic value. But MoneyBags was not using the photos for their artistry. Rather, by placing the pictures in the context of comments about Sheth, MoneyBags gave the photos a new meaning—an expression of the author's apparent distaste for the lifestyle and moral compass of one-percenters. This transformation fits squarely within Section 107's examples of fair use, particularly "criticism" and "comment." *See Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1177 (9th Cir. 2013) ("[A]n allegedly infringing work is typically viewed as transformative as long as new

expressive content or message is apparent," even where the work "makes few physical changes to the original or fails to comment on the original."); *Katz v. Google Inc.*, 802 F.3d 1178, 1182–83 (11th Cir. 2015).

2. The second fair use factor—the nature of the copyrighted work—"recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works." *Dr. Suess Enterprises*, 983 F.3d at 455 (quoting *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997)). As a result, "fair use is more difficult to establish when the former works are copied." *Id.* (quoting *Penguin Books*, 109 F.3d at 1402). In evaluating this factor, courts also consider whether the copied work was previously published. *Id.*

Bayside states that its photos were "first published in 2017 and 2020."[4] The fact that the photos were already published at the time of the copying weighs in favor of fair use. *See Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 (9th Cir. 2003). Also weighing in favor of fair use is the fact that many of the photos appear to be candid shots in a public setting—the type of picture one would post to their Facebook or Instagram. *See Katz*, 802 F.3d at 1183.

On the other hand, a couple of the photos are somewhat more artistic. One photo, for example, depicts a woman standing in front of a mirror taking a selfie with her phone. The shot is taken by a third party, rather than the woman herself, and the lighting, positioning, and wardrobe appear to have been intentionally selected. Another photo is a self-portrait that, charitably construed, may have involved creative positioning of the subject's hair and deliberately applied makeup. That said, Bayside has made no attempt to provide evidence that the photographer "attempted to convey ideas, emotions, or in any way influence [the subject's]

---

[4] In what will emerge as a theme of this ruling, Bayside's assertion is not without doubt: Bayside notes the alleged publication dates in its opposition to Twitter's motion to quash, without any accompanying declaration. Normally the Court would decline to credit this unsupported assertion, but because it is not outcome determinative, its truth will be assumed for purposes of this motion (and this motion only). The Court interprets Bayside's phrasing (noting that the photographs were *first* published in 2017 and 2020) as implying that all the photos were published before they were tweeted by MoneyBags. This is the first (of many) issues where further evidentiary support from Bayside would have been helpful.

pose, expression, or clothing." *Id*. (Indeed, Bayside has not provided any information about the photographs, including who the photographer is, where the photos were taken, or the identity of the woman they feature.) At best, the second factor may tilt slightly in favor of Bayside due to the artistic elements of these latter photographs, although the factor is largely inconclusive.

3. The third factor considers the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor is not particularly helpful in the context of a photograph or drawing that "is not meaningfully divisible," as the entire work must be used to preserve any meaning at all. *Seltzer*, 725 F.3d at 1178; *see also Katz*, 802 F.3d at 1183–84. This factor is therefore neutral.

4. The fourth and final factor asks what effect the use has "upon the potential market for or value of the copyrighted work." § 107(4). Analysis of this factor requires courts to consider "not only the extent of the market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market" for the original and derivative works. *Dr. Seuss Enterprises*, 983 F.3d at 458 (internal quotations omitted) (quoting *Campbell*, 510 U.S. at 590).

When a use is transformative and non-commercial, it is difficult to infer market harm. In such a case, "it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it." *Campbell*, 510 U.S. at 591. To make a prima facie case of copyright infringement in this context, Bayside must offer some explanation for how its financial interests in the copyrights could be harmed by a use like the tweets at issue here.

Bayside offers that it is a "communications and strategic advisory firm" that "licenses photographs for commercial exploitation." But beyond this vague explanation of its business model, Bayside nowhere explains what the potential market for these licenses is, let alone how that market could be impacted by tweets like MoneyBags's. Further, Bayside's explanation of its business is hard to accept at face value given the suspicious circumstances surrounding this

motion (more on that later). And Bayside declined an opportunity (offered at the hearing) to supplement the record with actual evidence of market harm. This factor therefore weighs in favor of fair use.

* * *

Taking into account all of these factors, Bayside has not established a prima facie case of copyright infringement.

B

Even if Bayside had made a prima facie showing of copyright infringement, the subpoena would still need to be quashed because the balance of equities tilts in MoneyBags's favor.

Considering "the nature of the speech" at issue, there is no question that significant First Amendment interests are at stake. *In re Anonymous Online Speakers*, 661 F.3d 1168, 1177 (9th Cir. 2011). The six tweets flagged by Bayside are best interpreted as vaguely satirical commentary criticizing the opulent lifestyle of wealthy investors generally (and Brian Sheth, specifically). For example, one tweet reads: "Good morning from Mrs. Brian Sheth #2. Life is good when you're a 44-year old private equity billionaire." The tweet accuses Brian Sheth of having a mistress and links his infidelity to the broader class of "private equity billionaires," suggesting that wealth (or working in private equity) corrupts. Unmasking MoneyBags thus risks exposing him to "economic or official retaliation" by Sheth or his associates. *McIntyre v. Ohio Elections Commission*, 514 U.S. 334, 341–42 (1995). And MoneyBags's interest in anonymity is heightened further by his other tweets, which discuss issues of political importance such as sexual harassment, tax enforcement, and corporate regulations.

This is where the mystery surrounding Bayside makes a difference. If the Court were assured that Bayside had no connection to Brian Sheth, a limited disclosure subject to a protective order could perhaps be appropriate. But the circumstances of this subpoena are suspicious. As far as the Court can tell, Bayside was not formed until the month that the tweets about Sheth were posted on Twitter. It appears that Bayside had never registered any copyrights until the registration of these six photographs, which happened after the tweets were posted. And

12

there appears to be no information publicly available about Bayside's principals, staff, physical location, formation, or purposes.

Rather than explaining these puzzling facts, Bayside's counsel simply filed a declaration stating that "Bayside is not and has not ever been owned or controlled by Brian Sheth." The declaration also notes that Brian Sheth does not own, and has not ever owned, "any interest in the copyrights to the Photographs."[5] Even setting aside the fact that this declaration came from counsel, rather than a party with personal knowledge of its veracity, it raises more questions than it answers. Is Bayside owned or controlled by someone associated with Brian Sheth? Was Bayside formed in response to these tweets? How did Bayside come to acquire these copyrights, and from whom? When pressed at the hearing, Bayside's counsel, Lawrence Hadley, would not (or could not) expand on these vague assertions.

> Mr. Hadley: I can say that—that the subject of the tweets has no ownership interest in Bayside. This is all set forth in an affidavit.
>
> . . .
>
> The Court: . . . [D]oes the subject of the tweets—Mr. Sheth, does he know anybody who is connected [to] Bayside?
>
> Mr. Hadley: I don't know. I don't know who the person is, and I don't know who they know.
>
> The Court: Okay. Who—can you name a person who is connected to this company called Bayside? Can you name—can you give me some names of people who operate or work for Bayside?
>
> Mr. Hadley: My client contact is a person named Mr. Kaufman.

Dkt. No. 52 at 48.

Of course, even a weighty First Amendment interest may give way in the face of a strong interest on the other side. But here too, the Court is left scratching its head. It is not clear what Bayside has to gain from pursuing a copyright action against MoneyBags. Injunctive relief is

---

[5] Bayside makes these same claims about Robert Smith and Bob Brockman—two associates of Brian Sheth who are also mentioned in some of MoneyBags's tweets.

unavailable, as Twitter has already taken the photos down. Because Bayside registered the copyrights after the alleged infringement, it appears as though Bayside could recover only limited damages that are unlikely to cover the considerable expense of pursuing its copyright claims and no attorney fees. *See* 17 U.S.C. § 412. And as discussed in the preceding section, Bayside has offered no information on the market harm it could conceivably have suffered as a result of the postings. All Bayside has offered in support of its identity are a few vague descriptions of its services—claiming it is a "communications and strategic advisory firm" that "licenses photographs for commercial exploitation." A visit to Bayside's website (which the Court conducted with Bayside's counsel present during the hearing) revealed a shell of a site with no information about Bayside, what it does, who owns the company, who works for the company, or how any customer could license the photographs the company allegedly owns. *See Bayside Advisory LLC*, https://baysideadvisory.com [https://perma.cc/26DU-3NNT] (captured May 16, 2022).

Given all the unknowns, at oral argument the Court offered Bayside an opportunity to supplement the record with an evidentiary hearing or additional documentation. Bayside declined, stating that it preferred the motion to be adjudicated on the current record. There would perhaps be some benefit in insisting on an evidentiary hearing to explore the circumstances behind this subpoena—to explore whether Bayside and its counsel are abusing the judicial process in an effort to discover MoneyBags's identity for reasons having nothing to do with copyright law. Perhaps that hearing could even result in an award of attorney's fees for Twitter. But Twitter stated that it too prefers not to have an evidentiary hearing. Accordingly, the record will stand, and the people connected to this mysterious company will succeed in preserving their own anonymity. But Bayside's choice not to supplement the record makes it quite easy to balance MoneyBags's interest in preserving his anonymity against Bayside's alleged interest in protecting its apparent copyrights. On this record, even if Bayside had made a prima facie showing of copyright infringement, the Court would quash the subpoena in a heartbeat.

* * *

Twitter's motion to quash is granted and Bayside's motion to compel is denied.

**IT IS SO ORDERED.**

Dated: June 21, 2022

_____

VINCE CHHABRIA
United States District Judge